# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| RONALD GORNY, individually and on behalf of all others similarly situated, ) ) ) | |
| Plaintiff, ) ) | |
| vs. ) ) | Case No. 18 C 8259 |
| WAYFAIR INC. and WAYFAIR LLC, ) ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Ronald Gorny filed this putative class action against Wayfair Inc. and Wayfair LLC—collectively "Wayfair"—alleging violations of Illinois contract and tort law arising from his purchase of a headboard from Wayfair.com. Wayfair has moved to compel arbitration under the dispute resolution provision of its website's terms of use. For the reasons stated below, the Court grants Wayfair's motion.

## Background

The following facts are undisputed unless otherwise noted. In early July 2018, Gorny accessed Wayfair.com and purchased an upholstered headboard for his bed. This was not Gorny's first time on the website. Indeed, according to data provided by Wayfair, he had visited Wayfair.com on at least 200 separate occasions and had made two previous purchases from the website. During those visits, Gorny had apparently viewed more than 13,000 distinct pages on the site. Each of these pages included a link to Wayfair's terms of use.

A couple of days after he ordered it, Gorny received the headboard and installed it in his home. He says he soon discovered a large number of small insects, which turned out to be bedbugs, infesting the headboard's upholstery. According to Gorny, he promptly complained to Wayfair about the problem. Wayfair, for its part, says that its records indicate no such complaint was ever made directly to its customer service department. Rather, Gorny apparently indicated the bedbug infestation exclusively in a comment box at the end of a consumer satisfaction survey he completed some fifty-five days after he received the headboard.

Wayfair contends that this dispute does not belong in court. Initially, Wayfair contends that it is unlikely that the headboard became infested before it got to Gorny. More importantly, though, Wayfair contends that, irrespective of the source of the bedbugs, this dispute falls within the scope of a binding agreement to arbitrate that it contends Gorny assented to when he used Wayfair.com and when he ordered the headboard. Wayfair notes that a hyperlink to the terms of use, which included the relevant provision, appeared on each of the more than 13,000 pages Gorny visited on Wayfair.com and that Gorny was specifically admonished on several occasions that "by continuing to the site, you agree to the updated Terms of Use and Privacy Policy." Klein Decl., dkt. no. 21-1, ¶ 11. Moreover, Gorny was specifically notified before ordering the headboard—and before making his two previous orders—that, "[b]y placing an order, you are agreeing to our Privacy Policy and Terms of Use." This message appeared immediately below the large purple "Place Your Order" button that Gorny had to press in order to initiate his order, as reproduced below.



*See id.* ¶ 7.

Among other provisions, the terms of use include the following paragraph addressing dispute resolution:

> **YOU AND WAYFAIR AGREE TO GIVE UP ANY RIGHTS TO LITIGATE CLAIMS IN A COURT OR BEFORE A JURY OR TO PARTICIPATE IN A CLASS ACTION OR REPRESENTATIVE ACTION WITH RESPECT TO A CLAIM.  OTHER RIGHTS THAT YOU WOULD HAVE IF YOU WENT TO COURT, SUCH AS ACCESS TO DISCOVERY, ALSO MAY BE UNAVAILABLE OR LIMITED IN ARBITRATION.**

Ex. A to Klein Decl., dkt. no. 21-1, at 23.  The terms of use go on to specify, in relevant part, that:

> Any dispute between you and Wayfair, its agents, employees, officers, directors, principals, successors, assigns, subsidiaries or affiliates (collectively for purposes of this section, 'Wayfair') arising from or relating to these Terms of Use and their interpretation or the breach, termination or validity thereof, the relationships which result from these Terms of Use, including disputes about the validity, scope or enforceability of this arbitration provision (collectively, "Covered Disputes") will be settled by binding arbitration.  Prior to initiating any arbitration, the initiating party will give the other party at least 60-days' advanced written notice of its intent

to file for arbitration.

*Id.* The agreement then specifies how the parties should notify one another of a dispute and sets out the parameters for any eventual arbitration. *See id.*

After Gorny fired off his scathing consumer survey, Wayfair responded with an apology and a coupon. A couple months later Gorny filed this suit on behalf of himself and others similarly situated. He contends that he is one of many customers who have received products from Wayfair that were infested with bedbugs; he also contends that Wayfair has ignored the problem. In his nine-count complaint, Gorny alleges breach of contract and warranty (counts 1, 6, and 7), negligence (count 2), and consumer fraud and deceptive trade practices under Illinois and several other states' laws (counts 3, 4, 5, and 8). He also alleges that Wayfair was unjustly enriched (count 9). Wayfair has moved to compel arbitration under the dispute resolution provision of its terms of use.

## Discussion

"The [Federal Arbitration Act] provides for stays of proceedings in federal district courts when an issue in the proceeding is referable to arbitration, and for orders compelling arbitration when one party has failed or refused to comply with an arbitration agreement." *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 289 (2002). "As the Supreme Court repeatedly has emphasized, arbitration is a creature of contract." *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1033 (7th Cir. 2016). "[C]ourts must place arbitration agreements on an equal footing with other contracts, and enforce them according to their terms." *Gore v. Alltel Commc'ns, LLC*, 666 F.3d 1027, 1032 (7th Cir. 2012) (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011)). Because arbitration is a matter of contract, "a party cannot be required to submit to arbitration any

4

dispute which he has not agreed so to submit." *Id.* (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002)).

Analysis of a motion to compel arbitration typically begins with a judicial determination of whether a contract was formed under the applicable state's law. *See First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *Sgouros*, 817 F.3d at 1033 (turning "first to the question whether an agreement to arbitrate arose between TransUnion and Sgouros"); *Gore*, 666 F.3d at 1032. Courts generally assess the scope of an arbitration agreement—and, more precisely, whether the claims at issue fall within the scope of the governing provision—only after they have made a determination regarding contract formation. *See, e.g.*, *Johnson v. Uber Techs., Inc.*, No. 16 C 5468, 2018 WL 4503938, at *4-5 (N.D. Ill. Sept. 20, 2018) (analyzing formation under Illinois law before turning to the scope of the relevant arbitration agreement). The parties, however, have organized their argument in the opposite order. Because the order of analysis is immaterial to the outcome of this motion, the Court adopts the parties' organization.

Gorny presents three arguments. First, he contends that, even assuming that the arbitration clause from the terms of use is valid and enforceable, his claims fall outside the scope of the provision. Second, Gorny argues that no binding agreement was ever formed between the parties. Third, he argues that even if the Court finds that his claims fall within the scope of a binding arbitration clause, that clause should be found enforceable only with respect to his claims against Wayfair LLC and not those against its parent company, Wayfair, Inc. The Court addresses each argument in turn.

5

### A. Scope

Gorny first argues that his claims fall outside the scope of the arbitration clause in Wayfair's terms of use. Wayfair initially argues that the scope of the arbitration clause is itself reserved for arbitration. It may well be correct. *See Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 528 (2019) ("When the parties' contract delegates the arbitrability question to an arbitrator, the courts must respect the parties' decision as embodied in the contract.") The Court need not decide whether the claims' arbitrability is reserved for an arbitrator, however, because even assuming it is not, Gorny's arguments fail.

Gorny contends that, if there is an arbitration agreement, it does not encompass his claims. Specifically, he contends that the plain language of the contract limits the arbitration clause to disputes "arising from or relating to the[] Terms of Use." According to Gorny, the terms of use cover only "issues related to Wayfair's privacy policy, intellectual property rights, rules governing user-generated content, social media usage, and the Wayfair Rewards program." Pl.'s Br. in Opp'n to Mot. to Compel Arbitration, dkt. no. 25, at 2. He argues that his claims sound purely in tort, do not rely on the terms of use, and therefore do not relate to the "use of the website." *Id.* at 1-2. In Gorny's view, if Wayfair's terms were intended to cover claims arising from the sale of products, "it should and could have drafted 'Terms of Sale' instead." *Id.* at 2.

But, the Court notes, "once it is clear . . . that the parties have a contract that provides for arbitration of some issues between them, any doubt concerning the scope of the arbitration clause is resolved in favor of arbitration as a matter of federal law." *Gore*, 666 F.3d at 1032. Moreover, "[w]hether a particular claim is arbitrable depends

not upon the characterization of the claim, but upon the relationship of the claim to the subject matter of the arbitration clause." *Id.* at 1036 (internal quotation marks omitted). Thus Gorny cannot simply characterize his claims as unrelated to the arbitration clause; to prevail, he must provide the Court "with positive assurance that the arbitration clause is not susceptible of any interpretation that covers the asserted dispute." *Id.* (internal quotation marks omitted). He has not done so.

The arbitration clause in Wayfair's terms of use employs broad, unambiguous language, capturing any dispute "arising from or relating to the[] Terms of Use . . . [or] the relationships which result from the[] Terms of Use . . . ." Ex. A. to Klein Decl., dkt. no. 21-1, at 23. Gorny advocates a reading that would effectively limit the contract to disputes arising from the navigation of Wayfair's website, and perhaps intellectual property disputes related to the imagery displayed on it. But that reading ignores much of the provision's language—most critically the portion about disputes arising from relationships resulting from the terms of use—and, as a result, is contrary to law. The Seventh Circuit has described the sort of language used in this agreement as "a very broad, standard arbitration clause," the likes of which courts have "naturally been willing to read . . . quite broadly to include all manner of claims tangentially related to the agreement, including claims of fraud, misrepresentation, and other torts involving both contract formation and performance." *Welborn Clinic v. MedQuist, Inc.*, 301 F.3d 634, 639 (7th Cir. 2002). In other words, this language reaches "all disputes having their origin or genesis in the contract, whether or not they implicate interpretation or performance of the contract per se." *Gore*, 666 F.3d at 1033.

The Court concludes that, under the terms of the contract and directly controlling

7

Seventh Circuit authority, Gorny's claims "aris[e] out of or relat[e] to . . . the relationships which result from the[] Terms of Use" and are therefore within the scope of the arbitration clause. Contrary to Gorny's narrow characterization, the Wayfair terms of use include numerous provisions governing the purchase and sale of goods, such as those regarding warranties and product complaints. As a result, the terms of use shape the contours of a contractual buyer-seller relationship. That is unsurprising, given that the "use" of a retail website like Wayfair.com typically involves purchasing products. A dispute related to the purchase of goods through Wayfair.com necessarily implicates this buyer-seller relationship and thus unambiguously arises out of the website's terms of use and/or a relationship governed by them. *Cf. O'Neil v. Comcast Corp.*, No. 18 C 4249, 2019 WL 952141 (N.D. Ill. Feb. 27, 2019) (discussing similar language and reaching the same result).

Gorny's citations to cases such as *Welborn Clinic*, 301 F.3d at 639, and *Sarantakis v. Gruttadauria*, No. 02 C 1609, 2003 WL 1338087 (N.D. Ill. Mar. 17, 2003), only bolster the Court's conclusion. The courts in those cases confronted significantly narrower arbitration clauses than the one at issue here. Indeed, both opinions acknowledge that the arbitration clauses in question were unusually narrow because they failed to adopt the broad "relating to or arising from" language recommended by the American Arbitration Association. *See Welborn Clinic*, 301 F.3d 634 (contrasting a narrow arbitration clause that was, by its own terms, limited to one aspect of the parties' relationship with the "very broad" standard arbitration clause "recommended by the American Arbitration Association"); *Sarantakis*, 2003 WL 1338087, at *4 (contrasting a "broad, standard arbitration clause" with one of the two clauses at issue in the case).

8

Here, in contrast, the arbitration provision adopts language almost identical to that which the Seventh Circuit has "naturally been willing to read . . . quite broadly." *Welborn Clinic*, 301 F.3d at 639; *see also Gore*, 666 F.3d at 1033.

As noted above, Gorny's complaint includes nine claims alleging violations of Illinois' (and, in one case, several other states') laws. Each of these claims alleges an injury arising out of or resulting from Gorny's purchase of a headboard on Wayfair.com. That purchase was governed—subject to the following discussion of contract formation—by the terms of use. The arbitration clause included in the terms of use, by its plain language, covers each of Gorny's claims. As a result, the Court overrules Gorny's argument that his claims are beyond the scope of the agreement.

Finally, Gorny's effort to skirt the arbitration clause by recharacterizing his claims as arising purely in tort by disclaiming any argument "relying in any way on the Terms of Use" also fails. As the court in *Sarantakis* acknowledged, "[t]he Seventh Circuit has repeatedly cautioned that plaintiffs cannot escape their contractual obligation to arbitrate by casting their claim as one arising in tort." *Sarantakis*, 2003 WL 1338087, at *4 (citing *Fyrnetics (Hong Kong), Ltd. v. Quantum Group, Inc.*, 293 F.3d 1023, 1030 (7th Cir.2002); *Sweet Dreams Unlimited, Inc. v. Dial-A-Mattress Int'l, Ltd.*, 1 F.3d 639, 643 (7th Cir.1993)). Beyond being observably inaccurate,[1] Gorny's attempt to characterize all of his claims as arising purely under a tort products liability theory is precisely the sort of effort to skirt an arbitration provision foreclosed by the Seventh Circuit. The

---

[1] Counts 1 (breach of contract), 6 (breach of implied warranty of merchantability), and 7 (violation of Illinois' Magnuson Moss Warranty Act) expressly arise under contract theories. Of the remaining counts, only count 2 alleges a common-law tort, while the remaining counts (3, 4, 5, 8, and 9) allege various forms of fraud and deception arising from Wayfair's sales practices.

Court accordingly declines to entertain those efforts.

**B.     Formation**

Having concluded that Gorny's claims are covered if the arbitration clause is binding, the Court next steps back to assess whether the parties have a binding contract. Whether an agreement to arbitrate has been formed is governed by state law. *Sgouros*, 817 F.3d at 1034. The terms of use on Wayfair's website include a choice-of-law provision that designates Massachusetts law as controlling. Neither party contends, however, that there is any substantive difference between the governing standards in Illinois and Massachusetts, so the Court need not perform a choice-of-law analysis and will apply the law of Illinois, the forum state. *See Johnson*, 2018 WL 4503938, at *3; *see also Nationwide Advantage Mortg. Co. v. GSF Mortg. Corp.*, 827 F.3d 577, 580 (7th Cir. 2016).

At the core of this dispute is a question about offer and acceptance of an online purchase agreement. In determining whether the parties formed a contract in these circumstances, the Court need not find that the party seeking to avoid arbitration actually read or signed the contract. *Hill v. Gateway 2000, Inc.*, 105 F.3d 1147, 1148 (7th Cir. 1997) ("A contract need not be read to be effective; people who accept take the risk that the unread terms may in retrospect prove unwelcome."). Rather, the Court must ask "whether the web pages presented to the consumer adequately communicate all the terms and conditions of the agreement, and whether the circumstances support the assumption that the purchaser receives reasonable notice of those terms." *Sgouros*, 817 F.3d at 1034. "This is a fact-intensive inquiry" requiring the Court to "look more closely at both the law and the facts to see if a reasonable person in [the plaintiff's]

shoes would have realized that he was assenting" to a contract. *Id.* at 1034-35.

The Court finds instructive—as did the Seventh Circuit in *Sgouros*—the Illinois Appellate Court's opinion in *Hubbert v. Dell Corp.*, 359 Ill. App. 976, 835 N.E.2d 113 (2005). The court in *Hubbert* found that a customer who bought a computer online was sufficiently apprised of the contents of Dell's terms of service where a visible hyperlink appeared on each of the pages involved in completing the order. *Id.* at 984, 835 N.E.2d at 122. Notably, the form in question admonished that "[a]ll sales are subject to Dell's Term[s] and Conditions of Sale." The court ultimately concluded that the statement indicating that sales were subject to the terms—including the hyperlinks to the terms themselves—was sufficient to "place a reasonable person on notice that there were terms and conditions attached to the purchase and that it would be wise to find out what the terms and conditions were before making a purchase." *Id.*

*Sgouros* also involved an online purchase. In contrast with *Hubbert*, however, the pages necessary to place the order "contained no clear statement that [the] purchase was subject to any terms and conditions." *Sgouros*, 817 F.3d at 1035. Rather, the only statement to that effect appeared below the cutoff in a scroll box on the order page. Moreover, the Seventh Circuit noted that the language used on the relevant page "actively misle[d] the customer" by including a critically incomplete statement of what the customer was consenting to by placing his order. *Id.*

This case presents many of the same questions as *Hubbert* and *Sgouros*. Wayfair contends that the parties formed a contract when Gorny agreed to the terms of use by clicking on the "Place Your Order" button when purchasing the fateful headboard. It emphasizes that the following statement appeared in clear, conspicuous

11

text immediately below the order button: "By placing an order, you are agreeing to our Privacy Policy and Terms of Use." The underlined text was hyperlinked to the relevant terms, which included the arbitration clause discussed above. Wayfair also argues that Gorny was previously apprised of the existence and application of the terms of use when he made orders on two earlier occasions, and when he, on several occasions, viewed a banner at the top of the Wayfair.com homepage announcing that the terms had changed and that continued use of the website indicated assent to the terms.

For his part, Gorny argues that he never "saw" the terms of use, that he was never sufficiently apprised of the terms' contents, and that he never signed the arbitration agreement. He relies almost exclusively on cases rejecting so-called "browsewrap" agreements, wherein a website owner sought to enforce its terms of use without evidence that a user was ever prompted to manifest his or her agreement to the terms. *See, e.g.*, *Be In, Inc. v. Google Inc.*, No. 12-CV-03373-LHK, 2003 WL 5568706, at *9 (N.D. Cal. Oct. 9, 2016) ("[A party's] mere use of the website can only serve as a manifestation of assent where [the party] had, or should have had, reason to know that mere use would be so interpreted."). In Gorny's view, the agreement at issue here was just such a browsewrap contract. He contends that it would therefore be contrary to Illinois law to hold him to the agreement. Notably, however, Gorny does not address the statement notifying customers of the terms of use that undisputedly appeared on the checkout page.

The Court concludes that the web pages presented to Gorny adequately communicated all the terms and conditions of the agreement and that the circumstances support the inference that he received reasonable notice of those terms.

Unlike the cases Gorny cites in which website owners sought to enforce their terms of use without ever requiring any manifestation of acceptance, undisputed evidence establishes that Gorny accessed Wayfair.com repeatedly and made purchases using forms that, like those in *Hubbert*, expressly notified the buyer of the existence of terms that would govern the purchase. Gorny's complaints that he did not actually read the terms are of no consequence. *See Hill*, 105 F.3d at 1148. Likewise, his suggestion that he should not be held to the contract because he never physically signed it is unsupported by law. *See Sgouros*, 817 F.3d at 1033 ("Courts around the country have recognized that this type of electronic 'click' can suffice to signify the acceptance of a contract.").

Because the parties had an enforceable contract that, as discussed previously, included an arbitration provision encompassing Gorny's claims, the Court must grant the motion to compel arbitration.

## C.  Applicability to claims against Wayfair, Inc.

The only question that remains is whether this conclusion applies to both defendants. Gorny argues that any arbitration agreement exists only between him and Wayfair LLC, and that Wayfair Inc., Wayfair LLC's parent company, was not a party to the agreement. As a result, Gorny contends, his claims against Wayfair Inc. are not covered by the agreement to arbitrate. Wayfair counters that the relevant provision is broad enough to capture the claims against both defendants. It argues that Wayfair LLC included claims against its parent company in the arbitration clause by defining the clause as applying to all disputes with "Wayfair, its agents, employees, officers, directors, principals, successors, assigns, subsidiaries or *affiliates* (collectively for

13

purposes of this section, 'Wayfair')." Ex. A to Klein Decl., dkt. no. 21-1, at 23 (emphasis added). Wayfair then cites the Black's Law Dictionary definition of "affiliate," which includes "[a] corporation that is related to another corporation by shareholdings or other means of control" such as a "subsidiary, parent, or sibling corporation." *Affiliate*, Black's Law Dictionary (10th ed. 2014); *see also Gammon v. GC Servs. Ltd. P'ship*, 27 F.3d 1254, 1257-58 (7th Cir. 1994) (adopting this definition in another context).

Wayfair is clearly correct. Wayfair Inc. is Wayfair LLC's parent company and is therefore covered by the arbitration agreement. It may thus enforce the arbitration provision in relation to the claims against it. *See Taylor v. Samsung Elecs. Am.*, No. 16 C 50313, 2018 WL 3921145, at *4 n.5 (N.D. Ill. Aug. 16, 2018) (reaching the same result).

## Conclusion

For the foregoing reasons, the Court grants the defendant's motion to stay these proceedings and to compel arbitration [dkt. no. 20]. Because the case will be pending before an arbitrator for the foreseeable future, the Clerk is directed to administratively terminate the case.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: June 7, 2019

14